# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

                              Case No. 10-CR-2213 MV

    v.

William Belin,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on William Belin's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Docs. 129, 141. Having considered the briefing, relevant law, and being otherwise fully informed, the Court finds that Mr. Belin's motion is well taken and will be **GRANTED**. Exercising its authority to modify Mr. Belin's sentence for extraordinary and compelling reasons under 18 U.S.C. § 3582(c)(1)(A)(i), the Court will reduce his term of imprisonment to a term of time served and place him in a residential reentry facility with location monitoring for a period of six months.

The Court stays this order for up to 14 days to allow the Bureau of Prisons time to process Mr. Belin for release and make appropriate travel arrangements to the Diersen halfway house facility. There shall be no delay in ensuring travel arrangements are made. If more than 14 days are needed to make appropriate travel arrangements and ensure Mr. Belin's safe release, the parties shall immediately notify the Court and show cause why the stay should be extended.

## BACKGROUND

On July 27, 2010, Mr. Belin was charged in a four-count Indictment with Assault with Intent to Commit Murder, Assault with a Dangerous Weapon, Assault Resulting in Serious Bodily

Injury, and Use of a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 113(a)(1), 113(a)(3), 113(a)(6), 924(c)(1)(A)(iii), and 1153. Doc. 9. The charges arose after Mr. Belin shot Cassandra Nez with a .22 caliber rifle on July 7, 2010. Presentence Investigation Report ¶ 5. The bullet struck Ms. Nez on the side of her left shoulder and then exited her back, just below her neckline. *Id.* She survived the shooting after receiving treatment for the gunshot wound as well as other cuts and bruises she sustained during the assault, but suffered permanent bodily injury, as the bullet fragments remain lodged in her back and shoulder, resulting in two permanent scars. *Id.* Following trial, a jury returned a verdict on June 22, 2011, finding Mr. Belin guilty of all four counts. Doc. 52. On November 3, 2011, this Court sentenced Mr. Belin to 300 months with three years of supervised release. Mr. Belin's anticipated release date is October 26, 2031, at which point he will be 77 years old. Doc. 141 at 2.

Mr. Belin filed a bare-bones Motion for Compassionate Release with Court-Appointed Counsel on October 2, 2020. Doc. 129. The Federal Public Defender subsequently filed a motion for the appointment of CJA counsel in Mr. Belin's case. Doc. 130. On November 6, 2020, this Court appointed counsel, and on September 13, 2022, Mr. Belin—now represented—filed an Amended Motion for Compassionate Release or Reduction in Sentence. Docs. 131, 141. The government filed a response, and the defense has filed a reply. Docs. 148, 151.

## STANDARD

Under 18 U.S.C. § 3582(c)(1)(A)(i), federal courts are permitted to reduce an individual's term of imprisonment and modify their conditions of supervised release if, after consideration of the factors set forth in 18 U.S.C. § 3553(a), "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Prior to the passage of the First Step Act of 2018, only the director of the Bureau of Prisons ("BOP") could move for a reduction under the statute, leaving

federal prisoners powerless to apply for compassionate release on their own behalf. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018). However, in 2018, Congress amended the law to allow incarcerated individuals to move for sentence reductions under § 3582(c)(1)(A)(i) once they have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [their] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

A district court may grant a motion for a sentence reduction if three requirements are satisfied:

> (1) the district court finds that extraordinary and compelling reasons warrant such a reduction; (2) the district court finds that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and (3) the district court considers the factors set forth in § 3553(a), to the extent that they are applicable.

*United States v. Maumau*, 993 F.3d 821, 831 (10th Cir. 2021). While "district courts may *deny* compassionate-release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others," in order to *grant* a motion for compassionate release, the court "must of course address all three steps." *United States v. McGee*, 992 F.3d 1035, 1043 (10th Cir. 2021) (emphasis added) (citing *United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021) and *United States v. Navarro*, 986 F.3d 668, 670 (6th Cir. 2021)); *see also United States v. Hald*, 8 F.4th 932, 938 (10th Cir. 2021).

With respect to the first factor, the Tenth Circuit has held that district courts "have the authority to determine for themselves what constitutes 'extraordinary and compelling reasons,' but that this authority is effectively circumscribed by the second part of the statutory test." *Maumau*, 993 F.3d at 834. However, because "the Commission has been unable to comply with its statutory duty of promulgating a post-First Step Act policy statement . . . the Sentencing Commission's

3

existing policy statement is applicable only to motions filed by the Director of the BOP, and not to motions filed directly by defendants." *Id.* at 836–37. Thus, district courts "possess the authority to determine for themselves what constitutes 'extraordinary and compelling reasons,'" on movant-filed motions, and are not bound by the Commission's current policy statements. *Id.* at 832, 836.

Still, this Court may choose to look to the current policy statement—United States Sentencing Guidelines § 1B1.13—for non-binding guidance. *See United States v. Carr*, 851 F. App'x 848, 853 (10th Cir. 2021) (noting that "it was within the district court's discretion to conclude the application notes to USSG § 1B1.13 still provided the best definition and description of 'extraordinary and compelling reasons' under the circumstances" but that Tenth Circuit case law required the district court to recognize that § 1B1.13 was non-binding and to "exercise its independent authority and discretion.").

## DISCUSSION

### I.    Exhaustion

Notably, 18 U.S.C. § 3582(c)(1)(A) includes an exhaustion requirement that a movant must satisfy before a court can consider his motion for compassionate release. *United States v. Hemmelgarn*, 15 F.4th 1027, 1030 (10th Cir. 2021). Exhaustion under 18 U.S.C. § 3582(c)(1)(A) requires that—before filing for compassionate release—an incarcerated person make an initial request for release to the facility warden pursuant to 28 C.F.R. § 571.61, followed by an appeal of a denial pursuant to § 571.63. 18 U.S.C. § 3582(c)(1)(A); *see also* 28 C.F.R. § 571.60–571.64. However, if 30 days lapse from receipt of the request and a warden has not taken action, a district court may consider the motion. 18 U.S.C. § 3582(c)(1)(A).

Mr. Belin has satisfied § 3582's exhaustion requirement.[1] In Mr. Belin's initial *pro se*

---

[1] The defense argues that the government has waived any exhaustion claim by failing to raise it in

4

Motion for Compassionate Release on October 2, 2020, he reported having filed a sentence reduction request with his facility's warden on July 14, 2020. Doc. 129 at 1. Thus, at the time of filing on October 2, 2020, well over 30 days had passed since the initial request, bringing the motion into compliance with § 3582. In response, the government objects that the BOP does not have a record of Mr. Belin's request, while also acknowledging that FCI Lompoc's Reduction in Sentence Coordinator "cannot definitively certify that no request was made given that the alleged request was made over two years ago and during the initial stages of the COVID-19 pandemic." Doc. 148 at 6–7.

District courts have deemed a claim exhausted in the absence of evidence documenting that the movant submitted a release request to the warden. *See, e.g.*, *United States v. Arndt*, No. 3:17-CR-00088-TMB, 2022 WL 17976260, at *3 (D. Alaska Dec. 28, 2022) ("Courts have accepted such assertions where there is no reason to assume bad faith on the part of the defendant." (footnote omitted)). Courts have also accepted a movant's assertion that he submitted a request in the face of BOP claims to the contrary. *See, e.g.*, *United States v. Levario*, No. 2:12-cr-00399-JAM-1, 2020 U.S. Dist. LEXIS 105211, at *4 (E.D. Cal. June 15, 2020) ("The government fails to provide any compelling reasons why BOP's recent recordkeeping is entitled to more credibility than Levario's representations." (internal citation omitted)); *see also United States v. Schley*, No. CR19-0247-JCC, 2021 WL 4860863, at *1–2 (W.D. Wash. Oct. 19, 2021); *United States v.*

---

response to Mr. Belin's initial *pro se* Motion for Compassionate Release [Doc. 129] and the Federal Defenders' Motion to Appoint CJA Counsel [Doc. 130], which were filed in October 2020. Doc. 151 at 1. Because § 3582's exhaustion requirement is a claim-processing rule, it is waivable. *Hemmelgarn*, 15 F.4th at 1030–31. However, the government has not done so here. Unlike cases in which the government failed to raise an exhaustion claim before the relevant court, here, the government argued exhaustion in its first response to Mr. Belin's Amended Motion for Compassionate Release. *Cf. Id.* at 1030 ("Though the government argued that Hemmelgarn failed to exhaust his administrative remedies below, it waived any such arguments on appeal."). Thus, the defense's waiver argument is unavailing.

*Kazanowski*, No. 15-CR-00459-DKW-5, 2020 WL 3578310, at *4 n.11 (D. Haw. July 1, 2020).

Specifically, courts have noted that "it would be difficult for [an inmate] to prove at this stage that the [w]arden actually received his request," particularly where the person is proceeding *pro se* and "it is unlikely he had the wherewithal or perhaps ability to make a copy before doing so." *Kazanowski*, 2020 WL 3578310, at *4 (citing *United States v. Drummondo-Farias*, No. CR 12-00174 (1) JMS, 2020 WL 2616119, at *4 (D. Haw. May 19, 2020)). Additionally, courts have described issues with BOP record-keeping—particularly during the COVID-19 pandemic—as undermining the BOP's credibility on the question of exhaustion. *See, e.g.*, *United States v. Richardson*, No. 2:17-CR-00048-JAM, 2020 WL 3402410, at *2 (E.D. Cal. June 19, 2020) ("[O]ver the past few months, the BOP has—on several occasions—incorrectly represented the status of inmates' exhaustion efforts . . . While the Court is not assuming bad faith, it bears mentioning that these mistakes come at a cost to defendants. The Court therefore finds the BOP's alleged lack of records in this case not to be controlling."); *Levario*, 2020 U.S. Dist. LEXIS 105211, at *4 ("Over the past few months, the BOP's recordkeeping has—on more than one occasion—painted an incorrect picture about defendants' exhaustion efforts . . . these mistakes, even if innocent, come at a cost. And it is the defendants seeking emergency relief who invariably foot the bill." (internal citation omitted)). Thus, the fact that the BOP lacks records of a movant's initial request does not foreclose exhaustion.

Here, Mr. Belin claims that he submitted a request to the warden on July 14, 2020, amidst the height of the COVID-19 pandemic. Specifically, Mr. Belin reports that he tendered his request—of which he did not have a copy—to a correctional officer who said he would provide the request to a case manager. Doc. 151-1. The Court has "no reason to assume bad faith on the part of" Mr. Belin in describing his request on July 14, 2020. *Arndt*, 2022 WL 17976260, at *3.

6

Additionally, the government has not "provide[d] any compelling reasons why BOP's recent recordkeeping is entitled to more credibility than [Mr. Belin's] representations," particularly in light of the fact that the BOP's record-keeping was inconsistent during the pandemic and Mr. Belin was proceeding *pro se*, making it unlikely that he would have—or could have—made a copy of his request. *Levario*, 2020 U.S. Dist. LEXIS 105211, at *4. Instead, the government recognizes its inability to "definitively certify" the status of Mr. Belin's request, in part because he made it "during the initial stages of the COVID-19 pandemic." Doc. 148 at 6–7. The Court thus finds that Mr. Belin has provided sufficient evidence of exhaustion.

Finally, the government objects that Mr. Belin did not provide a release plan in his initial request for compassionate release, thereby violating 28 C.F.R. § 571.61, which requires that such a request include, inter alia, submission of "[p]roposed release plans." Doc. 148 at 17; 28 C.F.R. § 571.61(a)(2). The defense responds that Mr. Belin did provide release plan information. *Id.* Notably, the release plans attached to Mr. Belin's motion are dated December 2020 and January 2021, suggesting that he could not have attached them to his initial July 14, 2020 request. Docs. 151-2, 151-3. However, the December 2020 release plan—which is hand-written—includes a note stating that "[o]n the copy on July 14th reduction request was never received back form the warden" [sic], suggesting that a release plan *was* attached to the initial request, for which there is no record. Doc. 151-2. In other words, it appears that any pandemic-era record-keeping issues that resulted in missing requests would likewise be responsible for the absent release plan. Thus, for the same reasons that the Court finds Mr. Belin to have furnished sufficient evidence of an initial request, it also finds sufficient evidence to demonstrate provision of a release plan.

## II.    Extraordinary and Compelling Reasons for Release

On the merits, Mr. Belin first argues that the BOP's inability to meet the minimum

standards of care in addressing his medical conditions constitutes an extraordinary and compelling reason supporting his release.  Doc. 141 at 15.  Second, and relatedly, the defense contends that Mr. Belin's vulnerability to COVID-19 supports his release.  *Id.* at 17–20.  The government objects that Mr. Belin's health issues do not justify release.  Doc. 148 at 19.  While the government acknowledges that Mr. Belin suffers from several health conditions (including hyperlipidemia, benign hypertrophy of the prostate, and obesity), it argues that he is in Care Level 1—the lowest care level—and receiving treatment for his health issues.  *Id.* at 19–21.  Additionally, the government asserts that Mr. Belin is likely receiving better medical care in BOP custody than he would in the community.  *Id.* at 21.  Lastly, the government responds that the COVID-19 pandemic cannot justify Mr. Belin's release, because he (a) is fully vaccinated and (b) has previously contracted and recovered from the illness.  Doc. 148 at 21–26.  Below, the Court addresses each argument in turn.

### a.   Inadequate Provision of Medical Care

The Court finds that the BOP's inadequate response to Mr. Belin's medical conditions—namely its striking delays and lack of follow up—constitutes an "extraordinary and compelling" reason warranting his release under § 3582(c)(1)(A)(i).  In general, "[t]he Eighth Amendment guarantees inmates in BOP custody the right to adequate medical care for a serious medical need," but "does not require that the BOP provide optimal medical care or the care of an inmate's choosing."  *United States v. Williams*, No. 3:04CR95/MCR, 2020 WL 1751545, at *4 (N.D. Fla. Apr. 1, 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976); *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991)).  Nonetheless, numerous district courts have found that the BOP's inadequate provision of medical care can qualify as an extraordinary and compelling reason for release, even where medical conditions are

not life-threatening.  *See, e.g.*, *United States v. English*, No. 219CR20164TGBEAS1, 2022 WL 17853361, at *5 (E.D. Mich. Dec. 22, 2022) ("even if it is not clear that English's medical conditions alone are life-threatening, the record here demonstrates that the mismanagement of these conditions creates extraordinary and compelling circumstances warranting compassionate release"); *United States v. Burr*, No. 1:15-CR-362-1, 2022 WL 17357233, at *6 (M.D.N.C. Dec. 1, 2022) ("Inadequate medical care may be a relevant factor in finding extraordinary and compelling reasons under § 3582(c)(1)(A)."); *United States v. Edwards*, No. CR 03-234 (JDB), 2022 WL 2866703, at *5 (D.D.C. July 21, 2022) ("persistent inadequate medical care can constitute an extraordinary and compelling reason warranting sentence reduction if the defendant's medical needs require release"); *United States v. Derentz*, 608 F. Supp. 3d 189, 193 (E.D. Pa. 2022) ("Courts have also found that . . . delays in treatment, may qualify as an extraordinary and compelling reason for compassionate release."); *see also United States v. Verasawmi*, No. CR 17-254 (FLW), 2022 WL 2763518, at *7 (D.N.J. July 15, 2022); *United States v. Roman*, No. 2:14-CR-43, 2021 WL 3173351, at *4 (S.D. Ohio July 26, 2021), *aff'd,* No. 21-3718, 2022 WL 363866 (6th Cir. Jan. 7, 2022); *United States v. Almontes*, No. 3:05-CR-58 (SRU), 2020 WL 1812713, at *6 (D. Conn. Apr. 9, 2020); *United States v. Beck*, 425 F. Supp. 3d 573, 580–81 (M.D.N.C. 2019).

In particular, courts have deemed delays in treatment "extraordinary and compelling." *Burr*, 2022 WL 17357233, at *6 ("Many courts have explicitly found that lengthy and unexplained delays of needed medical care can be extraordinary and compelling circumstances."). For example, a district court has found extraordinary and compelling circumstances where the BOP "continually failed to act with necessary expediency to ensure . . . urgent and consistent medical care," including by failing to biopsy a bone tumor for four months or follow up on a diagnosis. *English*, 2022 WL 17853361, at *6. In that court's words, "[d]uring this time, [the incarcerated

person] surely experienced significant anxiety over an uncertain diagnosis, while BOP failed to make any meaningful treatment plan." *Id.* The court in *English* ultimately found the BOP's medical care inadequate despite the fact that pathology results ultimately indicated that the tumor was non-cancerous, explaining that "it is due only to good fortune that BOP's delay in completing this biopsy in a timely manner did not allow a malignant tumor to grow and potentially inflict fatal damage." *Id.*; *see also Verasawmi*, 2022 WL 2763518, at *10; *Almontes*, 2020 WL 1812713, at *6.

Recently, a district court found extraordinary and compelling circumstances where there was an "unexplained delay of at least a year in arranging for [the movant's] surgery." *United States v. Lopez*, No. 09-CR-332-10, 2023 WL 2139205, at *6 (N.D. Ill. Feb. 21, 2023). According to the court in *Lopez*, such delay—in tandem with other factors—"demonstrate[d] that Lopez [was] unlikely to receive better treatment if he remain[ed] in BOP custody." *Id.* Likewise, another district court found that medical negligence supported release where the BOP failed "to schedule and follow through on completing an endoscopy for Mr. Burr for almost two years despite ongoing abdominal pain." *Burr*, 2022 WL 17357233, at *7. According to the court, this "[f]ailure to timely diagnose a gastric ulcer could result in a failure to diagnose and timely treat cancer, with potentially deadly results." *Id.* The court came to this conclusion despite the fact that the BOP had "not ignored Mr. Burr's abdominal pain"—for instance, by conducting testing and prescribing medication for symptoms—but had not scheduled the endoscopy necessary to determine if he had cancer. *Id.* ("[T]he fact that the BOP has provided some care does not excuse its deliberate indifference to Mr. Burr's serious medical needs . . . The BOP's failure to obtain an endoscopy for Mr. Burr has caused pain and suffering unrelated to any penological purpose and raises a real possibility of late treatment for cancer with all the accompanying uncertainties and physical and

10

mental consequences."); *see also Verasawmi*, 2022 WL 2763518, at *7–9 (delays in scheduling follow-up appointments for cardiology, neurology, and pulmonology); *Derentz*, 608 F. Supp. 3d at 193 (delays in scheduling follow-up for an eye condition); *Roman*, 2021 WL 3173351, at *4 (failure to schedule appointments to address glaucoma); *Almontes*, 2020 WL 1812713, at *6–7 (failure to follow up on a physical condition through referral); *Beck*, 425 F. Supp. 3d at 580–81 (delays in investigating and treating symptoms of breast cancer).

Here, the BOP has displayed a striking lack of responsiveness to symptoms that carry potentially life-threatening significance. Most notably, Mr. Belin has exhibited elevated prostate-specific antigen ("PSA") levels since at least 2019.[2] Docs. 141 at 16; 141-9 at 1; 141-10 at 212. Critically, elevated PSA levels "can be a sign of prostate cancer." *Elevated PSA (Prostate-Specific Antigen) Level*, CLEVELAND CLINIC (Apr. 6, 2021), https://my.clevelandclinic.org/health/diseases/15282-elevated-psa-prostate-specific-antigen-level. In response, the BOP has ordered urology consults on three separate occasions,[3] but there is no record that such consults ever took place—despite the fact that the referrals set target dates of December 23, 2020 and April 6, 2022 for the appointments. Docs. 141-9 at 212;141-10 at 1, 18, 21; 141-11 at 5, 14. Over two years have thus passed since the first referral with no follow up.

The government argues that the BOP has addressed Mr. Belin's elevated PSA levels by

---

[2] The government argues that Mr. Belin's justifications for compassionate release duplicate his sentencing arguments, which the Court already accounted for in applying a variance at sentencing. Doc. 148 at 2. With respect to Mr. Belin's medical arguments, it is true that the Presentence Investigation Report at sentencing documented that Mr. Belin had "been diagnosed with an enlarged prostate and prescribed Flomax for the condition." Presentence Investigation Report ¶ 72. However, the Presentence Investigation Report makes no mention of Mr. Belin's PSA levels. Thus, the Court did not specifically consider his PSA levels at sentencing.

[3] Specifically, the BOP ordered referrals on September 24, 2020; December 8, 2020; and April 9, 2021. Docs. 141-9 at 212;141-10 at 1, 18, 21; 141-11 at 5, 14. Additionally, notes from November 9, 2020 document consideration of a urology consultation. Doc. 141-10 at 4 ("urology consul consider at this time" [sic]).

prescribing him Finasteride, which appears to have decreased his PSA levels.  Doc. 148 at 11, 20.

Dr. Kristen Fiorentino[4]—who conducted a review of Mr. Belin's BOP medical records for the

defense—explains, however, that Mr. Belin's treatment with Finasteride only *increases* the

importance of a urology consultation, as Finasteride deceptively decreases a person's PSA levels

without lowering the underlying risk of prostate cancer.  Doc. 151-4 at 2.  In Dr. Fiorentino's

words, postponing testing "can result in delay of diagnosis of prostate cancer, with a greater

probability of nodal and metastatic disease on presentation."  *Id.*  As a result, she explains, best

practice is to double the PSA levels for someone on Finasteride, which for Mr. Belin, results in a

PSA level of 8.02—well above the normal limit of 4.5 and an increase from his prior levels.[5]  *Id.*

Thus, it appears that Mr. Belin's PSA levels are significantly above the normal limit.  The BOP's

failure to schedule a urology consultation in the 30 months since his first (of three) referrals is

extremely concerning.

Relatedly, the BOP has exhibited delays in other areas involving Mr. Belin's medical

treatment.  Specifically, the BOP has failed to schedule a colonoscopy for Mr. Belin, despite the

fact that medical staff requested one on July 21, 2021—21 months ago—with a target date of

November 18, 2021.  Doc. 141-8 at 3.  And as addressed directly below, delay has likewise marked

---

[4] The government describes Dr. Fiorentino as a "telehealth internist, who has not demonstrated, in any way, that she is an expert in the standard of care for prisons."  Doc. 148 at 14.  The defense responds that the government "misstates Dr. Fiorentino's credentials," and that "Dr. Fiorentino need not be a prison medical care expert to advise the Court on the dangers Mr. Belin faces by virtue of his health and environment."  Doc. 151 at 6 n.3, 9.  Dr. Fiorentino has maintained a Board Certification in Internal Medicine from the American Board of Internal Medicine since 1998.  Doc. 151-4 at 1.  She has worked in hospital and outpatient settings for 25 years and has published 15 articles in journals.  *Id.*; Doc. 141-7 at 2–3.  The Court thus finds Dr. Fiorentino sufficiently qualified to speak to Mr. Belin's healthcare.

[5] Mr. Belin's medical records note that his PSA levels tested at 5.05 on December 26, 2019.  Docs. 141-9 at 1, 141-10 at 212.  On November 9, 2020, they tested at 4.96, and then at 4.88 on December 9, 2020.  Doc. 141-10 at 4, 70.  Finally, on June 23, 2021, they tested at 4.01.  Doc. 141-11 at 5.

the BOP's administration of COVID-19 boosters.  *See infra* Section II(b).  Such practice—in tandem with the BOP's approach to Mr. Belin's elevated PSA levels—evinces a troublesome pattern of delay, demonstrating that the BOP is unable to provide adequate medical care to Mr. Belin.  The BOP's deficient provision of medical care—including striking delays in treatment and follow up—thus constitutes an extraordinary and compelling reason supporting a sentence reduction.

### b.  COVID-19

In general, "[t]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Delgado-Montoya*, No. 20-2125, 2021 WL 4946825, at *5 (10th Cir. Oct. 25, 2021) (citations omitted).  However, courts have found extraordinary and compelling reasons justifying release where medical diagnoses place a person "at a higher risk of severe illness and death from COVID-19." *United States v. Wilson*, No. 20-1324, 2021 WL 4859690, at *1 (10th Cir. Oct. 19, 2021) (type 2 diabetes mellitus and hypertension were extraordinary and compelling reasons for compassionate release); *see also United States v. Morris*, No. 16-20022-3, 2020 WL 5231319, at *3 (D. Kan. Sept. 2, 2020) ("[m]ost [courts] agree . . . an inmate demonstrates extraordinary and compelling circumstances if she has serious underlying health conditions that place her at an increased risk of serious illness or death from COVID-19 while incarcerated."); *United States v. Edington*, No. 19-cr-00174-REB-1, 2020 WL 2744140, at *3 (D. Colo. May 27, 2020) ("[T]he dangers presented by the pandemic . . . must be 'compelling' in [the movant's] particular circumstances.").

In determining whether an individual's vulnerability to COVID-19 is serious enough to merit compassionate release, courts often look to guidance from the Centers for Disease Control

and Prevention (CDC).  *See, e.g.*, *United States v. Avalos*, 856 F. App'x 199, 205 (10th Cir. 2021) (reversing district court's denial of compassionate release because the Tenth Circuit was "unable to conclude . . . that the district court properly applied the CDC guidance available at the time of its decision"); *see also United States v. Kibble*, 992 F.3d 326, 332–33 (4th Cir. 2021) (Gregory, C.J., concurring) (deciding whether someone is "at risk" requires "appropriate consideration of the risks identified by public health experts," including the CDC).

Notably, there is a growing consensus that COVID-19 vaccination weighs against compassionate release.  The Sixth and Seventh Circuits, for example, have held that "for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release."  *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021); *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021).  However, neither circuit has entirely foreclosed the possibility that a vaccinated individual could show an extraordinary and compelling vulnerability to COVID-19, acknowledging that some individuals are "unable to receive or benefit from a vaccine."  *Broadfield*, 5 F.4th at 803; *Lemons*, 15 F.4th at 747.  These rulings underscore the importance of highly individualized compassionate release analysis; it is clear that although vaccination status "reduce[s] [the] likelihood of contracting—or suffering severe complications—from the virus," district courts must continue to "carefully review[] . . . medical records and consider[] . . . arguments for release," when assessing whether "the risk [an individual] faces from COVID-19 complications [is] so 'extraordinary and compelling' that release from prison is warranted."  *United States v. Bullias*, No. 21-2268, 2022 WL 1562840, at *2 (7th Cir. May 18, 2022).

The Tenth Circuit has not issued binding guidance on how an individual's vaccination status impacts his compassionate release request.  However, in a recent unpublished opinion, the

court of appeals reasoned as follows:

> Given the effectiveness of COVID-19 vaccines, we agree with the Sixth and
> Seventh Circuits that a defendant's incarceration during the COVID-19
> pandemic—when the defendant has access to the COVID-19 vaccine—does not
> present an extraordinary and compelling reason warranting a sentence reduction.
> We also agree that a prisoner who is unable to receive or benefit from a vaccine
> may still be able to show extraordinary and compelling reasons warranting a
> sentence reduction.

*United States v. McRae*, No. 21-4092, 2022 WL 803978, at *2 (10th Cir. Mar. 17, 2022)

(unpublished) (cleaned up).  Indeed, vaccination *does* generally reduce one's risk of severe illness

or death from COVID-19 infection.  *See COVID-19 Vaccines Work*, Ctrs. for Disease Control &

Prevention,  https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html  (last

visited Mar. 31, 2023).  However, when a movant shows individualized medical evidence of

extraordinary and compelling vulnerability to COVID-19 despite vaccination, or when a movant

demonstrates extraordinary and compelling factors beyond medical vulnerability, a court may

grant release.

Here, Dr. Fiorentino asserts that Mr. Belin is at especially high risk for COVID-19 in light

of (a) his age, (b) his underlying conditions (namely, obesity, pre-diabetes, and chronic kidney

disease),[6] and (c) the fact that he is incarcerated.  Doc. 141-8 at 4.  Regarding his underlying

conditions, courts turn to the CDC for guidance.  *See Avalos*, 856 F. App'x at 205.  The CDC has

outlined which medical conditions contribute to more severe illness from COVID-19.  *People with*

*Certain   Medical   Conditions*,   Ctrs.   for   Disease   Control   &   Prevention,

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

---

[6] The government asserts that Mr. Belin has, at most, "mild" kidney disease.  Doc. 148 at 19 n.11.
In reply, Dr. Fiorentino explains that current medical nomenclature classifies kidney issues as
"Chronic Kidney Disease Stage X" (or "CKD X").  Doc. 151-4 at 1.  Using that nomenclature, she
states that Mr. Belin qualifies as CKD Stage 2.  *Id.*

conditions.html (last visited Mar. 30, 2023).  Several of Mr. Belin's medical conditions are on this list.  For example, obesity and chronic kidney disease "of any stage can make you more likely to get very sick from COVID-19."  *Id.*  And "[a] person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases."  *Id.*  Additionally, and critically, "[o]lder adults (especially those aged 50 years and older) are more likely . . . to get very sick from COVID-19" and the "risk increases with age."  *COVID-19 Risks and Information for Older Adults*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/aging/covid19/index.html (last visited Mar. 30, 2023).  Indeed, "[m]ost COVID-19 deaths occur in people older than 65."  *Id.*

On the face of this evidence, there can be no question that Mr. Belin is at high risk of severe illness from COVID-19.  His chronic kidney disease and obesity make him "more likely to get very sick from COVID-19."  *People with Certain Medical Conditions*.  His age—he is 70—is an additional risk factor.  *Id*.  All of these conditions combine to increase his risk of severe illness from COVID-19.  *People with Certain Medical Conditions*.  This is true despite the fact that the BOP has classified Mr. Belin at Care Level 1.  Doc. 148 at 19–20; Federal Bureau of Prisons, *Care Level Classification for Medical and Mental Health Conditions or Disabilities*, 4 (2019) (describing Care Level 1 inmates as "generally healthy," with "limited medical needs that can be easily managed").

On the other hand, Mr. Belin is not defenseless against COVID-19.  He has received both core vaccinations and one booster shot.  Doc. 148 at 6.  Additionally, Mr. Belin contracted and recovered from COVID-19 in May 2020.  Doc. 141-9 at 214.  There is no indication that Mr. Belin had a severe case of COVID-19.  The Court notes, however, that Mr. Belin did not receive his first booster until five months after the CDC recommended the *second* booster, and he has yet to receive

the second booster, which the CDC recommended on March 20, 2022—over a year ago.  Doc. 151-4 at 2.  In response to this delay, Dr. Fiorentino "quer[ies] why the BOP is not following the real time national recommendations by the CDC and a multitude of other panels."  *Id.*

As discussed *supra*, an incarcerated person "who is unable to receive or benefit from a vaccine may still be able to show extraordinary and compelling reasons warranting a sentence reduction."  *McRae*, 2022 WL 803978, at *2.   For example, if Mr. Belin were immunocompromised, he could demonstrate that he was "at increased risk of severe COVID-19 illness and death," because his "immune response to COVID-19 vaccination may not be as strong as in people who are not immunocompromised."  *COVID-19 Vaccines for People Who Are Moderately or Severely Immunocompromised*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/immuno.html        (last visited Mar. 30, 2023).  However, Mr. Belin's medical records do not indicate a history of cancer, organ transplant, use of corticosteroids, or a life-long weakened immune system.  *See People with Certain Medical Conditions* (listing causes of an immunocompromised condition).  Nor do his medical records otherwise indicate that he is unable to benefit from his vaccination.

"Given the effectiveness of COVID-19 vaccines" and Mr. Belin's failure to show individualized medical evidence of his vulnerability to COVID-19 *despite his vaccination*, the Court finds that his vulnerability to COVID-19 does not constitute an extraordinary and compelling circumstance justifying a reduced sentence. *McRae*, 2022 WL 803978, at *2; *see also COVID-19 Vaccines Work*.  However, the BOP's delay in providing the first booster and failure to provide the second booster constitutes yet another instance of the Bureau's inadequate provision of medical care, which is itself an extraordinary and compelling circumstance.  Thus, while the COVID-19 pandemic does not independently support the existence of extraordinary and

compelling circumstances in this case, the BOP's delays in vaccination do.

### III.     The § 3553(a) Factors

In evaluating Mr. Belin's Motion for Compassionate release, the  Court must also consider

the 18 U.S.C. § 3553(a) factors, which include "the need for the sentence imposed":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  Here, the Court finds that the factors set forth in 18 U.S.C. § 3553(a)

support reducing Mr. Belin's term of imprisonment to time served and ordering that he spend six

months in a residential reentry facility on location monitoring.  Below, the Court addresses each

of those factors in turn.

#### a.   The Offense

With respect to the need for the sentence imposed to reflect the seriousness of the offense,

to promote respect for the law, and to provide just punishment for the offense, Mr. Belin's offense

was appalling and extremely serious.  Mr. Belin drove to Ms. Nez's house with a firearm, where

he avoided fatally injuring her only through luck, as Ms. Nez dodged a direct hit.  Presentence

Investigation Report ¶ 8.  Not only did his actions permanently alter Ms. Nez's life—through

enduring physical and emotional damage—but he also enacted profound trauma on Ms. Nez's

daughter, who awoke to find her mother under assault and was forced to defend her mother with a

baseball bat in order to save her life.  *Id.*  The long-term impact of these actions cannot be

understated.

#### b.   Deterrence

While Mr. Belin's offense was incredibly serious, his punishment has been grave.  Having

spent roughly 12.5 years in custody, he has already served a substantial term of incarceration.
During that time, he has experienced profound loss, including the death of his mother and his son.
In January 2021, Mr. Belin's son, Wilbert, passed away at the age of 40 from COVID-19.  Doc.
141-1 at 4.  Just three months later, his mother passed away at age 87.  *Id.*  He was unable to be
present with his loved ones during their final years or attend their funerals.  Additionally, in the
past 12 years he has been unable to provide care for his elderly father—now in his 90s.  Doc. 141-
14.  During his incarceration, Mr. Belin has also endured serious medical issues, including two
knee replacements and—as addressed *supra* Section II(a)—inadequate treatment for serious health
conditions.  Doc. 148 at 20.

Finally, Mr. Belin has been incarcerated for the entirety of the COVID-19 pandemic.
During that time, he has been deprived of rehabilitative programming while detention facilities
have cycled in and out of lockdowns.  Additionally, he has faced increased exposure to—and
contracted—COVID-19, which presents serious risks for him in light of his age and underlying
medical conditions.  *See supra* Section II(b).  In each of these ways, Mr. Belin has been severely
punished.

### c.  Danger to the Community

The danger that Mr. Belin presents to the community—and in particular, to Ms. Nez—is a
serious consideration in this case.  In a letter to the Court, Ms. Nez expresses her concern about
the prospect of Mr. Belin's release, voicing fear that he will violate his conditions and retaliate
against her.  Doc. 148-3.  She specifically describes that she will "live with anxiety and fear if he
is released."  *Id.*

Mr. Belin's criminal history indeed raises concerns.  In addition to offenses involving
alcohol use, Mr. Belin has a history of domestic violence.  Presentence Investigation Report ¶¶

40–50.  Specifically, he has a conviction for Battery – Domestic from 2000 for an incident involving a former partner, Sylvia Smith,[7] who he punched in the mouth, causing a laceration to her lip.  *Id.* ¶ 42.  Additionally, Mr. Belin has twice been arrested for incidents involving Ms. Nez in September 2009 and February 2010.  *Id.* ¶ 49–50.

While these incidents are highly concerning, the Court also notes that Mr. Belin—who is now 70 years old—faces a reduced risk of recidivism based on his age.  *Cf. United States v. Gray*, No. 6:96-CR-03075-MDH, 2021 WL 4096030, at *7 (W.D. Mo. Sept. 8, 2021) ("at sixty-nine years old, risk of recidivism is remote").  According to a study from the Sentencing Commission, over an eight-year period, just 13.4 percent of individuals age 65 or older recidivated—in striking contrast to 67.6 percent of those under age 21.  KIM STEVEN HUNT & BILLY EASLEY II, U.S. SENT'G COMM'N, THE EFFECTS OF AGING ON RECIDIVISM AMONG FEDERAL OFFENDERS 3 (2017).  These decreased rates held true regardless of the length of sentence imposed.  *Id.*  Additionally, on the BOP's Prisoner Assessment Tool Targeting Estimate Risk and Needs (PATTERN) tool, Mr. Belin scores as low-risk (generally) and low-risk of violence upon release, signifying that he has a 91 percent chance of *not* recidivating.  Docs. 141-6, 141 at 14–15 (citing U.S. DEP'T OF JUSTICE OFF. OF THE ATTORNEY GENERAL, THE ATTORNEY GENERAL'S FIRST STEP ACT SECTION 3634 ANNUAL REPORT 4 (2020)).

Together, Mr. Belin's age and PATTERN score suggest that his risk of recidivism is generally low.  However, the Court is highly sensitive to Ms. Nez's concerns and thus will prohibit Mr. Belin from entering Shiprock, Farmington, or Kirtland, New Mexico—where she and her family live—or making any contact with her or her family members, ensuring distance between

---

[7] While Mr. Belin's wife—Sylvia Belin—shares a first name with Ms. Smith (his former partner), they are not the same person.

them following his release.  The Court will require Mr. Belin to adhere scrupulously to this condition; if he does not, this Court may sentence him to a period of significant incarceration.  The Court emphasizes that it will take any failure to comply with this condition extremely seriously in determining an appropriate sentence.

### d.  Rehabilitation

Notably, a court cannot grant compassionate release solely on the basis of rehabilitation.  As the Tenth Circuit has explained, "'[r]ehabilitation of the defendant alone,' Congress has stated, 'shall not be considered an extraordinary and compelling reason.'"  *McGee*, 992 F.3d at 1043 (quoting 28 U.S.C. § 994(t)).  However, while it is not a standalone justification for compassionate release, courts may appropriately consider rehabilitation on a motion for compassionate release.  *See, e.g.*, *United States v. Eccleston*, No. CR 95-0014 JB, 2021 WL 2383520, at *35 (D.N.M. June 10, 2021) (Browning, J.) (counting "rehabilitative efforts" as one factor constituting extraordinary and compelling circumstances).

Here, Mr. Belin has demonstrated commendable rehabilitation throughout his 12-plus years in custody.  First, Mr. Belin has earned multiple certificates, taken at least 43 educational classes, and participated in a drug education course while in BOP custody.  Doc. 141-1 at 9, 17–18.  He has also obtained his GED or high school diploma.  *Id.* at 17.  Throughout this time, he has maintained an exceptionally clean record, with just one disciplinary infraction from 2014 for a relatively minor issue (being inside the Food Service Warehouse).  *Id.* at 2–3; Doc. 141-5.  In addition, BOP records document that Mr. Belin is at minimum risk of recidivism and that he "[m]aintains good rapport with staff and other inmates" as well as "satisfactory contacts with family and friends."  Doc. 141-1 at 19.  As a result of this upstanding behavior, he is classified at

FCI Englewood—a low-security facility.  Doc. 141 at 14.

Additionally, Mr. Belin has articulated a newfound sense of purpose and desire to serve as a community resource and leader.  In a letter to the Court, he expresses significant remorse, describing his actions as "beyond unconscionable" and "pathetic."  Doc. 141-1 at 1.  He writes that "[r]egret, shame and guilt have been my constant companion for more than a decade," but that this "ever-present regret" has also "propelled me to better myself."  *Id.*  Going forward, he hopes to share his story and support Diné youth by imparting history and skills.  *Id.*

Letters from Mr. Belin's family members likewise emphasize the transformation they have seen in him.  His daughter, Jessica Means, writes about the "change in him," and how she has been "amazed that [her] dad, the most strict person [she] knew, had a softness to him now."  Doc. 141-3 at 5.  She has shifted from fearing him to speaking openly with him and knowing that he will listen.  *Id.*  Mr. Belin's wife of nearly 40 years, Sylvia Belin, likewise describes the changes in him, including that he is "more compassionate towards everyone now, including those he is incarcerated with."  Doc. 141-13 at 2.  She also notes his level of engagement during the past 12 years of incarceration, during which he has worked with others—including by ironing, sewing shirts, and mending socks—and participated in classes.  *Id.*  Finally, Mr. Belin's sister, Maxine Bradley, writes that  her "brother has a changed attitude towards people" and now "finds himself in prayer daily."  Doc. 141-14.  She "truly believe[s] he has changed his life" and the "old William has passed away."  *Id.*

Finally, § 3553(a) instructs a court to consider, inter alia, the provision of "medical care . . . in the most effective manner."  18 U.S.C. § 3553(a)(D).  As addressed *supra* Section II(a), the BOP's medical treatment in Mr. Belin's case—which has been marked by extreme delays and a lack of follow-up—suggests that the provision of medical care would be far more "effective" for

Mr. Belin outside of custody.

A holistic review of the § 3553(a) factors compels the Court to reduce Mr. Belin's term of imprisonment.  The offense in this case was undoubtedly grave: Mr. Belin seriously imperiled Ms. Nez's life, causing persistent physical and emotional damage to her and her family.  However, the Court believes that keeping Mr. Belin in custody for the remainder of his term of imprisonment would fail to meaningfully advance the purposes of sentencing.  Instead, the Court believes that placing Mr. Belin at a residential facility for a period of at least six months will continue to impose just punishment for his offenses by restricting his liberty while also reducing the risk to his health created by the BOP's striking delays in treatment—a risk that the Court did not anticipate and to which it certainly did not intend to expose Mr. Belin when it sentenced him.

## CONCLUSION

For the reasons stated above, Mr. Belin's Motion for Compassionate Release [Docs. 129, 141] is hereby **GRANTED**.  Exercising its authority under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act of 2018, the Court will reduce Mr. Belin's term of imprisonment to a term of time served, and modify his conditions of supervised release to include six months at a residential reentry center with location monitoring.  While at the residential reentry center, Mr. Belin must participate in a course in domestic violence.  Mr. Belin will be permitted to leave the residential reentry center for medical appointments, counseling services, and other purposes as his Probation Officer may deem essential.  However, Mr. Belin will not be permitted to visit Shiprock, Farmington, or Kirtland, New Mexico, or make any contact with Ms. Nez or her family members.  Finally, the Court will increase the period of supervised release to five years.  An amended judgment reflecting Mr. Belin's modified sentence and conditions of supervised release will be forthcoming.

The Court stays this order for up to 14 days to allow the Bureau of Prisons time to process Mr. Belin for release and make appropriate travel arrangements to the Diersen halfway house facility. There shall be no delay in ensuring travel arrangements are made. If more than 14 days are needed to make appropriate travel arrangements and ensure Mr. Belin's safe release, the parties shall immediately notify the Court and show cause why the stay should be extended.

ENTERED this 7th  day of June 2023.

_____

THE HONORABLE MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE